## THE NEVADA. THE CAPE CHARLES. THE CAR FLOAT NO. 14.

(District Court, E. D. Virginia. October 21, 1921.)

1. **Collision** ☞95(4)—**Vessel which continued to back toward piers after assenting to signal of approaching tug for starboard passage held at fault.**

Vessel, which continued to back across channel toward piers after assenting to tug's request for starboard passage, thereby narrowing the space between its stern and the piers, *held* at fault for the collision with the tug's car float, caused by narrowness of passage between the vessel's stern and the piers.

2. **Collision** ☞19—**Vessel must be plainly at fault, if other vessel's fault was sufficient in itself to bring about collision.**

Where one vessel is guilty of fault sufficient in itself to bring about the result, the other should not be lightly called on to participate therein, un-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

less for obvious and plain violation of the laws of navigation in bringing about the collision.

3. **Collision** ⊛⇒95(2)—**Tug attempting to pass between piers and stern of steamship held at fault for collision with steamship.**
Ocean-going tug, which continued at full speed toward passage between piers and stern of steamship, though steamship did not at first answer the tug's signal for starboard passage under Rules to Prevent Collisions of Vessels, art. 18, rule 1 (Comp. St. § 7892), and though the steamship, notwithstanding subsequent assent to other signal, continued to back toward piers, thereby narrowing the passage, *held* at fault for collision with steamship, in view of rules 3 and 9 and General Prudential Rules, arts. 27 and 29.

4. **Collision** ⊛⇒144—**Damages divided, where both vessels are at fault.**
Where collision was brought about by the combined negligence of two vessels, they should be held to divide the damages resulting therefrom.

In Admiralty. Libel by Frederick Hansen, master of the steamship Nevada, against the steam tug Cape Charles, owned by the New York, Philadelphia & Norfolk Railroad Company, and Car Float No. 14, in which defendant owner brings cross-libel against the steamship Nevada. Damages divided.

Hughes, Little & Seawell, of Norfolk, Va., for libelant. ·

Willcox, Cooke & Willcox and Hughes, Vandeventer & Eggleston, all of Norfolk, Va., for respondents.

WADDILL, Circuit Judge. The collision, the subject of these proceedings, occurred on the morning of November 2, 1920, in the Elizabeth river, Norfolk, Va., at Lambert's Point, off the Norfolk & Western Railroad Company piers. The Nevada, in whose behalf, as well as that of the cargo, the first libel was filed, was a Danish steamship, 362 feet long, 50 feet beam, and 24 feet deep, and the respondent tug Cape Charles and car float No. 14 was part of the fleet of the New York, Philadelphia & Norfolk Railroad Company, plying between Cape Charles and Norfolk, engaged in transporting railroad cars between those points. The Cape Charles was an ocean-going tug, 125 feet long, and the barge or car float 316 feet long, drawn on a hawser of 30 fathoms, according to the respondent, and considerably longer, as claimed by the libelant.

On the morning in question, the Nevada, laden with coal, was anchored on the western bank of the cut channel at Lambert's Point, off the piers, heading upstream, and about 7:45 hove anchor, and began to maneuver with a view of making her course down the river. While thus engaged the Cape Charles with its tow was proceeding up the river, en route to Norfolk, when the starboard bow of the barge collided with the starboard quarter of the Nevada, causing considerable damage. Each of the vessels in collision seek to place the blame for the accident on the other. So far as the Nevada is concerned, if the facts bore out her contention, she would be presumably blameless; but so far as the tow is concerned, upon its own showing, it is difficult to relieve it from at least partial responsibility in bringing about the disaster.

First. The claims of the Nevada will be considered. She insists that, while maneuvering for her departure down channel from her place of anchorage, with her stern towards Lambert's Point, and her bow pointing across and somewhat down the channel, the tide running ebb, she received a signal of two blasts from the Cape Charles, indicating her desire to pass astern the Nevada, between the latter and the Lambert's Point coal piers, which signal was assented to; that at this time the engines of the Nevada were working ahead, with her helm to port, and the ship making headway to the westward and northward, thus taking her away from the course desired to be taken by the tow; that after this exchange of signals the tow continued on its course with apparently an undiminished speed of seven or eight miles an hour, intending to pass under the stern of the Nevada, that is, between the Nevada's stern and the piers, and although the tug passed in safety, the barge for some unknown reason, failed to follow the tug and clear the stern of the Nevada, and caused the collision.

The sole question, so far as the Nevada is concerned, if her statement be true, is whether sufficient passageway was allowed for the tugboat to pass. She was then, as she claims, 250 to 300 feet out in the channel from the piers; her engines having been full speed astern for some four minutes, and the ship making slight headway to the westward and northward side of the channel, the tug and tow having been first observed when some half a mile away.

Manifestly, no collision could have occurred under those conditions, save by the tug and tow crossing from the eastern side of the channel, and running into the Nevada. The tow insists that the Nevada did not proceed to the northward and westward of the channel, but, even after giving assent to the tug's request for a starboard passage, she continued backing across to the eastward of the channel, so narrowing and prescribing the space between the stern of the Nevada and the piers, as to make impossible the passage of the car float, though the tug managed to escape by a few feet from colliding with the ship.

[1] Upon the correct determination of this question of fact the case turns, certainly so far as the ship is concerned, and the court's conclusion is that the evidence overwhelmingly establishes fault against the ship, namely, that she did not, even after giving her assent to the tug's signals, continue on her course forward. On the contrary, it is quite clear that she was then moving backwards through the water, and so continued approximately until the collision, and at that time the space between the Nevada and the piers was less than 100 feet. The Nevada admits that the nearest she came to the pier was from 75 to 80 feet, which was doubtless after assenting to the starboard signals; and had the ship been moving forward at the time these signals were given, even assuming that at that moment the vessels were 75 to 80 feet off the piers, there would probably have been no collision, and certainly there would have been none, if at the time of giving such assent, the ship was 250 to 300 feet from the piers. The manner of the collision, that is, by the car float bounding from the ship into the nearby piers, shows the narrowness of the space between the ship and the piers.

Moreover, the existence of this narrow space is overwhelmingly established by the testimony.

It thus appearing that no collision would have occurred according to the ship's own testimony, and that she crowded the course of the oncoming tow after assenting to its proposed maneuver, makes clear her liability primarily for the collision, as there could be no excuse justifying the Nevada taking up the entire passageway of the channel. That leaves open for consideration only the determination of whether or not the tug and tow should be held liable for their participation in the same.

[2, 3] Second. Having held that the Nevada was primarily liable for the collision, the tug and tow's connection therewith will now be considered, and while sight should not be lost of the rule that, where one vessel is guilty of fault sufficient in itself to bring about the result, the other should not be lightly called upon to participate therein, unless for obvious and plain violation of the laws of navigation in bringing about the same. Having due regard to this doctrine, and with an inclination strongly tending to favor the tug and tow in the circumstances, as the ship's navigation was entirely inexcusable, if not reckless, still it is difficult for the court upon the tug's own testimony to hold it blameless for what occurred. The navigators of the tug admit observing the Nevada maneuvering across the channel, approximately half a mile away. They first sounded a blast of two whistles (article 18, rule I, of Rules to Prevent Collisions of Vessels [Comp. St. § 7892]), indicating a desire to pass to starboard, to which no answer was made. A second signal of two blasts was given, and not answered. Then the tug sounded danger signals, to which no reply was received, and the ship apparently continued its backward movement. The tug again sounded two blasts, making the third request for the starboard passage, to which the Nevada gave its assent by answering with two whistles. Whereupon the tug continued on its course, attempting to effect the starboard passage under the stern of the Nevada, which, as before stated, the tug did safely, but the car float collided with the ship. The space between the stern of the Nevada and the piers, through which the car float had to pass, was not over 50 to 75 feet, and the Nevada was then, according to the tug, moving slightly astern. While the tug might have been misled by the maneuvering of the Nevada at the time it made its first request for the starboard passage, supposing the ship would move forward and not backward, it was broad daylight, and the tug saw, or was charged with knowledge (article 18, rule IX) that the ship was moving backward and not forward; and, moreover, it was doing a dangerous thing in attempting to cross the stern of the backing ship.

This doubtful maneuver was attempted a second time, without reply from the ship to the tug's signal. Thereupon danger signals were given, which should have been sounded upon the ship's failure to respond to the first passing signal, certainly if the tug did not understand the intention of the ship (article 18, rule III), but it was not done until after the second failure of the ship to respond, at which time the tug should, if necessary, have slackened speed, or stopped, or reversed, if

good seamanship so required, even in the absence of any specific rule directing her to do so. No response was made by the ship to the distress signals of the tug; yet, with knowledge of impending danger, and the necessity for taking every precaution to avoid collision or the risk thereof, the tug again renewed its request for the starboard passage, and, upon the same being assented to by the Nevada, made an ineffectual effort to pass under her stern, with the result, which should have been foreseen, that, while the tug passed clear, collision with the barge, whose hawser had been cast off, quickly followed. The undisputed testimony is that the tug and tow were making between 7 and 8 miles an hour, some of the evidence being that it was 7 or 8 knots. There is no claim that the tug at any time slowed down, or did anything to lessen its speed, but, on the contrary, proceeded headlong into a confessedly narrow space, from which there was no chance of escape.

The court's conclusion upon the whole case is that, while it feels that the tug might have been misled in the assumption that the steamship would move out of its way, it took chances in this respect, contrary to well-known maritime regulation and practice, and when it did so, especially after knowing of the danger ahead, without abating its speed or altering its course, it cannot escape liability for in part bringing about the collision. Good seamanship would have forbidden this course, and the General Prudential Rules (articles 27 and 29) prescribed for the government of navigators were apparently entirely lost sight of and ignored.

It seems clear to the court that, at least after sounding danger signals, the tug's efforts thereafter to pass the ship starboard to starboard, in the then nearness of the vessels one to the other, although assented to by the ship, was reckless and hazardous.

The court has proceeded upon the theory that the General Prudential Rules prescribed for the government of navigators should control this case, read in the light of rules 1, 3, and 9 of article 18. There is much force in the suggestion that the crossing rules, especially articles 19, 21, 22, and 23, apply, in which event the fault of the tug and tow, for in part bringing about the collision, would be even more palpable than under the prudential rules, and those cited in connection therewith, as governing the case.

[4] It follows, from what has been said, that the collision was brought about by the combined negligence of the Nevada and the tug and tow, and they should be held to divide the damages resulting therefrom. An order to that effect will be entered on presentation.